**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JANE DOE I and II, minors, by and through their Mothers and next friends, MARY DOE I and II, | ) ) ) | |
| | ) | No. 18 C 3201 |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Hon. Virginia M. Kendall |
| THE BOARD OF EDUCATION OF THE CITY OF CHICAGO and CASINO CRUZ, in his individual capacity and as an employee of the CHICAGO PUBLIC SCHOOLS, | ) ) ) ) ) | |
| *Defendants*. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Minors Jane Doe I and II, by and through their Mothers and next friends Mary Doe I and II, filed this lawsuit against the Board of Education of the City of Chicago and Casino Cruz asserting various federal and state law claims stemming from Cruz's alleged sexual harassment of the minor Plaintiffs and the Board's alleged reckless indifference toward and failure to protect the minor Plaintiffs from such harassment.  (Dkt. 1).  In the Amended Complaint, Plaintiffs assert a Title IX discrimination claim (Count XVI) against the Board on behalf of both Jane Doe I and II and assert the following state-law claims against the Board and/or Cruz: sexual battery (Counts I and IX) and intentional infliction of emotional distress (Counts VII and XV) against Cruz; failure to supervise (Counts III and XI), negligence (Counts IV and XII), willful and wanton conduct (Counts V and XIII), negligent retention (Counts VI and XIV), and negligent failure to control the conduct of Cruz (Count VIII) against the Board; and negligent infliction of emotional distress (Counts II and X) against both the Board and Cruz.  (*Id.*).  Jane Doe I also asserts a claim for false imprisonment (Count XVII) against Cruz.  (*Id.*).  The Board moved to dismiss all claims asserted

against it pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. 42). For the following reasons, the Board's Motion to Dismiss (Dkt. 42) is granted in part and denied in part.

## BACKGROUND

The following facts are taken from Plaintiffs' Amended Complaint and are accepted as true for purposes of the Board's Motions to Dismiss. *Clark v. Law Office of Terrence Kennedy, Jr.*, 709 F. App'x 826, 827 (7th Cir. 2017).

Casino Cruz was employed by the Board for nearly 20 years, first at Roberto Clemente High School (RCHS) from 1999 until February 2017 and then at Farrugut High School from August 2017 until June 2018. (Dkt. 40 at ¶¶ 19, 118, 126). During his tenure at RCHS, Clemente served as security guard, assistant dean, swim instructor, swim team coach and volleyball coach. (*Id.* at ¶¶ 20–21). In these roles, Cruz regularly engaged in "grooming" or sexually inappropriate behavior with female students. (*Id.* at ¶ 24). Cruz's various positions of authority, in particular his power to discipline students and make decisions regarding the extent of their participation in sporting activities, generally prevented students from confronting Cruz about his inappropriate conduct and/or disclosing such conduct to school officials or parents. (*Id.* at ¶¶ 23, 25). Despite this, by Fall 2016 when Jane Doe I and II started as freshman at RCHS, RCHS and the Board knew of several incidents of sexual harassment of female students by Cruz beginning as early as 1999.

## I.     Prior Incidents at RCHS (1999–2016)

In 1999–2000, Cruz was a security guard and the female swim coach at RCHS. (*Id.* at ¶ 27). During that time, a female student reported to Dolly Irizarry, a teacher at RCHS, that Cruz told the student in front of other female students that she had a "hot pussy." (*Id.* at ¶ 27–29). Ms. Irizarry reported the conduct to RCHS administration who with the help of the Board commenced an investigation, including interviewing Irizarry and other female students, but never disciplined

Cruz or contacted the Illinois Department of Children and Family Services (DCFS) about the comments. (*Id.* at ¶¶ 30–32). Cruz continued to work as a security guard and the female swim coach at RCHS. (*Id.* at ¶ 33).

In December 2002, M.T., a female student in Cruz's swim class, told RCHS administration that Cruz made her feel weird and did weird stuff to her and that Cruz regularly entered the women's locker room while she and other students were changing. (*Id.* at ¶¶ 36, 40). Other female students confirmed that Cruz would regularly walk in on girls changing in the locker room. (*Id.* at ¶ 43). One day while at the swimming pool, Cruz touched M.T.'s breast. (*Id.* at ¶ 37). M.T. told her mother that Cruz had touched her breast and her mother went to RCHS and reported the incident to RCHS Assistant Principal Conrad. (*Id.* at ¶ 38). Another time, Cruz threw M.T. into the pool. (*Id.* at ¶ 41). M.T. and her mother requested that the RCHS administration take action against Cruz. (*Id.* at ¶ 42). M.T. ultimately failed her swim class because she refused to be near Cruz. (*Id.* at ¶ 44). Eventually, M.T.'s mother contacted the Chicago Police Department who arrested Cruz on April 4, 2003 for physical battery against M.T. (*Id.* at ¶ 45). The Board and RCHS administration knew about the arrest yet continued to employ Cruz at RCHS. (*Id.* at ¶¶ 47–49).

In 2003–2004, R.L. was a student in Cruz's swim class at RCHS. (*Id.* at ¶ 50–52). After class, Cruz would regularly walk through the women's locker room while the female students were changing. (*Id.* at ¶ 54). R.L. told Cruz to stop doing so. (*Id.* at ¶ 54). R.L. and several other female students also told RCHS staff and administration that Cruz walked through the women's locker room while they were changing but RCHS administration ignored the conduct and took no action against Cruz. (*Id.* at ¶¶ 54–57).

In 2007–2008, S.H. was a student in a P.E. class moderated by Cruz. (*Id.* at ¶¶ 58–60). Cruz regularly walked into the women's locker room after class while female students were changing. (*Id.* at ¶ 61). S.H. and other female students in the class screamed at Cruz to stop doing so and notified RCHS staff and administration about his conduct but the RCHS administration never took any action against Cruz. (*Id.* at ¶ 65).

In 2012, a female student at RCHS filed a complaint received by the Board Investigations Unit and Law Department alleging Cruz sexually harassed her. (*Id.* at ¶ 66). The "Investigation Memorandum" provided to the Law Department reported that, according to the student, Cruz "flirt[ed]" with her, "hit[]" on her, "mess[ed]" with her, hit her in a playful manner, slapped her on the back of the neck, grabbed the back of her arm, flicked her and called her "Babe," and called her a "bitch" after she told him to stop. (*Id.* at ¶ 67). The Board never disciplined or counseled Cruz for his conduct or reported it to DCFS. (*Id.* at ¶ 68).

In January 21, 2014, several adult RCHS staff members observed Cruz slap a female student across the face multiple times while having a heated argument with her in a classroom. (*Id.* at ¶¶ 69–70). One witness reported the incident to DCFS. (*Id.* at ¶ 73). When RCHS Principal Marcey Sorenson learned of the incident, she called Cruz to her office and he admitted to slapping the student. (*Id.* at ¶ 74). The Board continued to employ Cruz and never disciplined him for the incident. (*Id.* at ¶¶ 75–76).

In Fall 2016, X.S., a female RCHS student, reported to her mother that Cruz played with her hair and made her feel uncomfortable. (*Id.* at ¶¶ 78–79). Her mother reported Cruz's conduct to a member of the Board Investigation Unit but the investigator never opened an investigation into the allegation or reported the conduct to DCFS. (*Id.* at ¶ 79).

In September 2016, Cruz was coaching the women's volleyball team and walked up behind a player, T.R., during warm-ups for a game and inappropriately touched her butt. (*Id.* at ¶ 82–83). The incident was reported to Assistant Principal Crosen who in turn never disciplined Cruz for his conduct or reported the incident to DCFS. (*Id.* at ¶¶ 84–85).

## II. Jane Doe I and II Incidents (2016–2017)

### A. Jane Doe I

When Jane Doe I started at RCHS in Fall of 2016, Cruz was the Dean of Students and a security guard stationed at the screening area on the first-floor entrance of the school. (*Id.* at ¶¶ 87–88). In September 2016, Jane Doe I forgot her ID and was directed to Cruz to obtain a temporary ID in order to be admitted into the school. (*Id.* at ¶¶ 89–90). Instead of handing the ID to Jane Doe I, Cruz "placed it on her forehead and proceeded to touch and caress [her] face with the back of his hand," making Jane Doe I feel "very nervous and scared." (*Id.* at ¶¶ 91–92).

On October 21, 2016, while dropping Jane Doe I off at school, her father approached Cruz and told him he would "kick Cruz's ass if [he] ever touched his daughter again." (*Id.* at ¶ 93). RCHS Dean of Students Albert Lawson witnessed the confrontation but never reported any incident to DCFS. (*Id.* at ¶ 94).

In or about late October 2016, Cruz placed Jane Doe I in a fifth-floor classroom alone with him making it clear she was not free to leave and directed her to type something on one of the computers in the room about an interaction with her boyfriend. (*Id.* at ¶¶ 94–95). Cruz leaned over Jane Doe I while she typed, "placed his head very close to [her] head and placed his arm on her arm," and then "leaned and pushed his body into [her] body and called her 'baby girl.'" (*Id.* at ¶¶ 96–97). Jane Doe I pushed her self away but "felt disgusted and scared because she could not get out of the fifth floor room." (*Id.* at ¶ 97).

In early November 2016, RCHS security guard Darlene Sierra Clark broke up an argument between Jane Doe I and another student and took Jane Doe I to Cruz. (*Id.* at ¶ 98). Cruz initially spoke angrily to Jane Doe I but, after Clark left the room, "soften[ed] his tone, rubb[ed] Jane Doe I's arm and [told] her it would be ok." (*Id.* at ¶ 99). Also in early November, Jane Doe I was talking loudly on an escalator in RCHS when Cruz "came up from behind her, touched [her] on her waist and whispered in her ear to 'stop yelling.'" (*Id.* at ¶ 100).

Shortly thereafter, Jane Doe I reported to Clark and RCHS Dean of Students Christopher Ellis that she did not like the way Cruz touched her and that Cruz "made her feel weird and uncomfortable." (*Id.* at ¶ 101). Clark and Ellis reported this to Dean Lawson and Principal Sorenson who determined the encounter with Cruz was "non-sexual." (*Id.* at ¶ 102). Neither Lawson, Sorenson, Clark nor Ellis reported the incident to DCFS. (*Id.* at ¶¶ 102–103). However, in January 2017, CPD reported the incident to DCFS, who investigated and ultimately "Indicated" the complaint after finding credible evidence of child abuse and/or grooming by Cruz. (*Id.* at 103).

### B.      Jane Doe II

Jane Doe II also started as a freshman at RCHS in Fall of 2016. (*Id.* at ¶ 104). In or about mid-December 2016, Jane Doe II was riding up an escalator at RCHS when Cruz "quietly approached [her] from behind, put his arm around [her], touched her inner thigh and said '…whats up F…?'" and then continued up the escalator. (*Id.* at ¶¶ 106–108). The encounter caused Jane Doe II to "flinch away from Cruz and feel angry and uncomfortable" and she immediately told her teacher and her mother what happened. (*Id.* at ¶¶ 109–10). Her mother contacted RCHS and the RCHS administration contacted DCFS and CPD about the allegations. (*Id.* at ¶¶ 110–11).

Jane Doe II and her mother were told a "Safety Plan" would be implemented to protect Jane Doe II but it never was. (*Id.* at ¶ 112). Cruz remained in the school and followed Jane Doe

II to her classes "making it impossible for [her] to continue to attend RCHS." (*Id.* at ¶ 114). As a result, in January 2017 she transferred to another school outside of the Chicago Public School district to get away from Cruz. (*Id.* at ¶ 115).

### C. Cruz's Arrest and Suspension

On January 17, 2017, CPD arrested Cruz and charged him with battery of Jane Doe I and Jane Doe II. (*Id.* at ¶ 117). Despite instructions that Cruz was not to have any contact with Jane Doe I or II, RCHS allowed Cruz to access RCHS where Jane Doe I was still a student. (*Id.* at ¶ 117). Cruz's continued intimidation of Jane Doe I caused her to experience "mental anguish, humiliation, and emotional and physical distress." (*Id.* at ¶ 117). In or about February 2017, the Board suspended Cruz with pay due to the arrest. (*Id.* at ¶ 118).

## III. Incidents at Farragut (2017–2018)

In August 2017, the Board transferred Cruz to work as a security guard at Farragut High School. (*Id.* at ¶ 119). Cruz was still awaiting a criminal trial for the battery of Jane Doe I and II at the time. (*Id.* at ¶ 120).

In January 2018, a Farragut teacher reported to Farragut administration via email that several female students had complained of inappropriate behavior by Cruz that made them feel uncomfortable, including playing with female students' pony tails, telling a student to come closer so he could smell her perfume, walking behind female students on the stairs and "star[ing] at their butt," and pushing a student's head as she entered a classroom. (*Id.* at ¶ 122–124). The teacher also reported that she observed Cruz and a female student screaming and hitting each other in the hallway. (*Id.* at ¶ 123). The Farragut administration forwarded the email to Farragut Principal Hamacker who in turn forwarded it to the Board Investigation Unit and Law Department. (*Id.* at ¶ 125).

The Board never opened an investigation or took any action to discipline Cruz or prevent his continued inappropriate behavior toward female students. (*Id.* at ¶¶ 126–127). Cruz continued to work at Farragut until June 15, 2018. (*Id.* at ¶ 126).

## LEGAL STANDARD

"To survive a motion to dismiss under 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.'" *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). "[I]t is not enough for a complaint to *avoid foreclosing* possible bases for relief; it must actually *suggest* that the plaintiff has a right to relief . . . by providing allegations that 'raise a right to relief above the speculative level.'" *E.E.O.C. v. Concentra Health Servs., Inc*., 496 F.3d 773, 777 (7th Cir. 2007) (citing *Twombly*, 550 U.S. at 555) (emphasis in original). The allegations "must be more than '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Olson v. Champaign Cty., Ill*., 784 F.3d 1099, 1098 (7th Cir. 2015) (citing *Iqbal*, 566 U.S. at 678). While the Court "accept[s] as true all of the well-pleaded facts . . . and draw[s] all reasonable inferences in favor of the plaintiff," *Forgue v. City of Chi.*, 873 F.3d 962, 966 (7th Cir. 2017), the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Olson*, 784 F.3d at 1099.

## DISCUSSION

Plaintiffs assert various federal and state law claims against the Board, all arising from Cruz's alleged sexual harassment of female students at CPS high schools, including Jane Doe I and II. (*See* Dkt. 40). Specifically, Plaintiffs claim the Board acted with deliberate indifference

to Cruz's sexual harassment of minor female students in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* (Count XVI). (*Id.*). Plaintiffs also assert claims for negligent infliction of emotional distress, failure to supervise, negligence, willful and wanton conduct, and negligent retention (Counts II–VI, X–XIV) under Illinois law and for negligent failure to control (Count VIII) under Illinois law and the Restatement (2nd) of Torts § 317 against the Board. (*Id.*). The Board moves to dismiss all counts asserted against it pursuant to Rule 12(b)(6).

## I.     Title IX Claim

Title IX provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). It is well established that a student may sue and recover damages against her school district for sexual harassment under Title IX. *See Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 76 (1992); *Hansen v. Bd. of Tr. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 604–05 (7th Cir. 2008); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *Smith v. Metro. Sch. Dist. Perry Twp.,* 128 F.3d 1014, 1021–22 (7th Cir. 1997). To state a claim for sexual harassment under Title IX, "the plaintiff must prove that: (1) plaintiff belongs to a protected group; (2) plaintiff was subjected to harassment; (3) the harassment was based on sex;(4) the harassment was so pervasive or severe that it altered the conditions of plaintiff's education; and (5) knowledge by school officials." *Mary M. v. N. Lawrence Cmty. Sch. Corp.*, 131 F.3d 1220, 1228 (7th Cir. 1997). When, as here, the Title IX claim "is based on a teacher's conduct, the plaintiff must prove that 'an official of the school district who at a minimum has authority to institute corrective measures . . . has actual notice of, and is deliberately indifferent to, the teacher's

misconduct.'" *Hansen*, 551 F.3d at 605 (quoting *Gebser*, 524 U.S. at 277); *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("[A] Title IX plaintiff can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference.").

The Board argues Plaintiffs' Title IX claim should be dismissed for failure to sufficiently plead that Cruz's alleged sexual harassment of Jane Doe I and II was so severe or pervasive that it altered the conditions of their education or that the Board was deliberately indifferent to the sexual harassment.

### A. Sufficiently Severe or Pervasive to Alter the Conditions of Education

To prevail on their Title IX claim, Plaintiffs must allege harassment "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). Whether the alleged conduct rises to the level of actionable "harassment" is a fact-specific inquiry, *Gabrielle M. v. Park Forest-Chi. Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003), and "depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Davis*, 526 at 650 (citation omitted). Courts may also look to Title VII law to determine whether the alleged sexual harassment is sufficiently severe and pervasive to constitute illegal discrimination on the basis of sex for purposes of Title IX. *Hendrichsen v. Ball State Univ.*, 107 F. App'x 680, 684 (7th Cir. 2004) (citing *Smith*, 128 F.3d at 1023).

The Board argues Plaintiffs' allegations fall short of harassment sufficiently severe or pervasive to deprive them of educational opportunities because they fail to allege their academic

performance was affected by the alleged harassment, relying primarily on *Hendrichsen*. (*See* Dkt. 42 at 5). In *Hendrichsen*, a university student sued the university under Title IX alleging sexual harassment by her professor created a hostile learning environment. 107 F. App'x at 684. Looking to Title VII law, the district court granted summary judgment in favor of the university finding that the student failed to show the professor's conduct amounted to severe or pervasive harassment that deprived her of educational opportunities. *Id.* at 684–85. The Seventh Circuit affirmed, explaining that the professor's conduct—"acting in an obsessive manner," "singling her out for his attention," sending "notes and flowers," "stalking," and "lurking" outside her apartment, all over a period of at most several weeks—was not objectively offensive and neither physically threatened nor humiliated the student. *Id.* at 684–85. The court found also that the student admitted that she received an A in the professor's class and almost all As in her courses over the following two semesters and, therefore, that her academic performance was unaffected. *Id.* at 685. Similarly, in *Gabrielle*, also cited by the Board, the court affirmed summary judgment in favor of defendants on plaintiff's Title IX claim, finding that the alleged student-on-student harassment was not sufficiently severe or pervasive to deprive a student of access to education where the plaintiff's "grades remained steady and her absenteeism from school did not increase." 315 F.3d at 823. Finally, the Board relies also on Title VII law holding that a single incident or isolated incidents of offensive sexual conduct by a supervisor to an employee are not sufficient to create an objectively hostile work environment to support its argument that the "isolated incidents" alleged by Plaintiffs are insufficient to support their Title IX claim. (Dkt. 42 at 6 (citing *Adusumilli v. Ill. Inst. of Tech.*, No. 97 C 8507, 1998 WL 601822, at *4 (N.D. Ill. Sept. 9, 1998), *aff'd*, 191 F.3d 455 (7th Cir. 1999) (single incident of unwanted touching by college professor insufficiently severe or pervasive to alter the conditions of her education) (citing *Saxton v. American Tel. & Tel.*

*Co.*, 10 F.3d 526, 533-34 (7th Cir. 1993) (two occasions of a male supervisor rubbing his hand along a female employee's upper thigh and kissing her did not create a hostile work environment for Title VII claim))).

These cases are distinguishable from Plaintiffs' claim first because the courts in *Hendrichsen* and *Gabrielle* were considering a motion for summary judgment and therefore "privy to all the information concerning the impact on the harassment on the victim's education." *See, e.g.,* S*.G. v. Rockford Bd. of Educ.*, No. 08 C 50038, 2008 WL 5070334, at *4 (N.D. Ill. Nov. 24, 2008) (denying motion to dismiss student's Title IX claim). At the motion to dismiss stage, the Court relies only on the allegations in the Complaint and asks whether they give rise to a plausible inference that the alleged harassment affected the student's education opportunities. It does not have the benefit of a full factual record on which to base its decision.

More importantly, however, none of the cases involve a Title IX claim for teacher-on-student harassment of a minor student; rather, they involve either a claim under Title VII for workplace harassment or a claim under Title IX for student-on-student harassment or teacher-on-student harassment of an adult student. This distinction is significant, as recognized by the Supreme Court in *Davis*:

> Courts, moreover, must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults. Indeed, at least early on, students are still learning how to interact appropriately with their peers. . . .
>
> The fact that it was a teacher who engaged in harassment in *Franklin* and *Gebser* is relevant. The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity. Peer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment.

526 U.S. at 651–53 (internal citations omitted).

It follows from *Davis* not only that courts must view harassment between adults differently than harassment involving a minor but also that courts require a greater showing that the alleged harassment affected a minor student's educational experience where her alleged harasser is a peer. *See, e.g., id.* at 652 ("The dropoff in [a student's] grades provides necessary evidence of a potential link between her education and [her peer's] misconduct" but is not sufficient; the claim "depends equally on the alleged persistence and severity of [her peer's] actions."). To the contrary, courts recognize that harassment by a *teacher* inherently harms students and affects their educational experience: "No one questions that a student suffers extraordinary harm when subjected to sexual harassment and abuse by a teacher, and that the teacher's conduct is reprehensible and undermines the basic purposes of the educational system." *Gebser*, 524 U.S. at 293.

Therefore, Plaintiffs need not allege specific facts showing precisely *how* their academic performance was affected, *i.e.* lower grades, increased absenteeism, etc., a required in the cases cited by the Board. The allegations that Cruz's misconduct made Jane Doe I feel "very nervous," "scared," "disgusted," "weird," uncomfortable" and "intimated" while at school and caused her to experience "mental anguish, humiliation, and emotional and physical distress" and that his misconduct made Jane Doe II feel "angry and uncomfortable" while at school and caused her to transfer to another high school outside the CPS district are sufficient to give rise to a reasonable inference that they were subject to sexual harassment by their teacher that deprived them of the same educational opportunities available to other students. In fact, the fact that Jane Doe II transferred to a different school district is sufficient in and of itself to allege Title IX liability as to her. *See, e.g., Rockford Bd. of Educ.*, 2008 WL 5070334, at *4 (N.D. Ill. Nov. 24, 2008) (alleged harassment sufficiently severe to state Title IX claim where student withdrew from school district altogether).

**B.**     **Deliberate Indifference to Known Incidents of Harassment**

As stated above, to succeed on a Title IX claim, a plaintiff must also show both that the school district had actual notice of the alleged harassment and acted deliberately indifferent to it. *Hansen*, 551 F.3d at 605.  The Board argues that it had actual notice only of the misconduct that Jane Doe I and II complained to RCHS about and that it reasonably responded to those complaints. (*See* Dkt. 56 at 5–6).  But Plaintiffs' deliberate indifference claim is broader than this in that it focuses on the Board's conduct *prior* to either of their own complaints against Cruz.  Specifically, Plaintiffs argue the Board was deliberately indifferent in failing to protect them from Cruz's misconduct despite more than 15 years of complaints of sexual harassment and physical abuse made against him by previous parents and students of RCHS.  (*See* Dkt. 40 at ¶¶ 228–42; Dkt. 53 at 7).

Under *Gebser*, "a plaintiff in a Title IX damages suit based on a teacher's behavior must prove both 'actual knowledge of misconduct, not just actual knowledge of the risk of misconduct, and . . . that the officials having that knowledge decided not to act on it.'"  *Hansen*, 551 F.3d at 605 (quoting *Delgado v. Stegall*, 367 F.3d 668, 672 (7th Cir. 2004), *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009)).  With regard to the first prong, "a school district need not possess actual knowledge of a teacher's acts directed at a *particular plaintiff*, but it must still have actual knowledge of misconduct that would create risks 'so great that they are almost certain to materialize if nothing is done.'"  *Id.* (emphasis in original) (quoting *Delgado*, 367 F.3d at 672).  Therefore, "if a teacher had been known to be a 'serial harasser,' a school district might be found to have actual knowledge of that teacher's misconduct and that students may be at great risk."  *Id.* (quoting *Delgado*, 367 F.3d at 672).[1]  A school district is

_____

[1] On February 5, 2019, the en banc Court of Appeals will hear argument in *Jane Doe No. 55 v. Madison Metropolitan School District* (No. 17-1521), which asks that court to consider the appropriate level of proof

"deliberately indifferent" to the risk where its response or lack thereof is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.

Here, Plaintiffs sufficiently allege the Board had actual knowledge of Cruz's sexual harassment of female students at RCHS before any incident involving Jane Doe I or II occurred. By Fall of 2016, at least seven incidents of harassment by Cruz had been reported to RCHS administration, four of which occurred within the four years leading up to the incidents involving Jane Doe I and II. These complaints were made by students, parents and even RCHS employees who witnessed the harassment or abuse first hand. In several instances, the allegations were confirmed by other students and in one instance Cruz actually admitted to the RCHS principal that he in fact abused a female student. In yet another, the police actually arrested Cruz for physical battery based on the parent's complaint. *See, e.g., Doe 4 v. Freeburg Cmty. Consol. Sch. Dist. No. 70,* 279 F. Supp. 3d 807, 814 (S.D. Ill. 2017) (finding as a matter of law that prior complaints of sexual harassment by at least five male students gave school officials actual knowledge of the risk the teacher posed to other male students before plaintiff ever became a student); *Doe 20 v. Bd. of Educ. of Cmty. Unit Sch. Dist. No. 5*, 680 F. Supp. 2d 957, 970 (C.D. Ill. 2010) (allegation that parents of three students complained to school officials of teacher's misconduct gave rise to plausible inference that school officials knew teacher had sexually harassed students and posed the same risk to students in the next school year). Despite having actual notice that Cruz had harassed, groomed and abused female RCHS students, the Board repeatedly refused for more than 15 years to discipline Cruz or to take any steps to prevent further misconduct. Instead, the Board continued to employ Cruz in his same roles as security guard and swim coach and even promoted him over

for actual notice in a Title IX claim, urging it to adopt the "substantial risk" standard that the majority of its sister circuits have, as opposed to the "almost certain risk" standard that the now-vacated panel opinion purported to apply. Because the plaintiffs' allegations here exceed the latter, higher bar, *Jane Doe No. 55* does not control the disposition of the Board's motion, and the Court need not consider the issue any further.

time to new positions—women's volleyball coach and Dean of Students—that provided him greater access to and authority over female RCFS students. *See, e.g., Rockford Bd. of Educ.*, 2008 WL 5070334, at *5 ("Although minimal, plaintiffs' allegations that the school did nothing significant to keep a known perpetrator of sexual abuse away from a victim are enough to allege a clearly unreasonable response."). All of these facts, taken as true and construed in Plaintiffs' favor, more than sufficiently state a claim under Title IX that the Board had actual knowledge that Cruz was a "serial harasser" such that he posed a great risk to female students at RCHS and acted "clearly unreasonably" by failing to take any significant steps to protect female students at RCHS, including Jane Doe I and II, against the known risk.

## II.     State Law Claims

The Board argues that Plaintiffs' remaining state-law claims against it are barred by the Illinois Tort Immunity Act, 745 ILCS 10/1-101 *et seq.* The Board cites various provisions of the Tort Immunity Act, each of which is addressed in turn below. The Tort Immunity Act provides affirmative defenses, *Van Meter v. Darien Park Dist.*, 799 N.E.2d 273, 280 (Ill. 2003), and plaintiffs generally need not anticipate and overcome affirmative defenses in their complaint. *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). However, plaintiffs may effectively plead themselves out of court by alleging facts sufficient to establish the affirmative defense in the complaint itself and, in such cases, dismissal is appropriate. *Id.*; *see also Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613–14 (7th Cir. 2014) (A motion to dismiss based on an affirmative defense "should be granted only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.") (citation omitted); *Van Meter*, 799 N.E.2d at 284 (An affirmative defense "must be apparent on the face of the complaint" to warrant dismissal.). The Board bears the bears the

burden of proving it is entitled to immunity under any provision of the Act. *Van Meter*, 799 N.E.2d at 280.

The Board alternatively argues that it cannot be liable for any claim involving Cruz's sexual assault of Jane Doe I and II because (a) Cruz was not acting within the scope of his employment when he committed the alleged sexual misconduct and (b) the Board had no duty to Jane Doe I or II to prevent criminal acts committed by Cruz.

## A.    Failure to Enforce Board Policies, §§ 2-103, 2-205

The Board claims that Sections 2-103 and 2-05 of the Tort Immunity Act provide it absolute immunity from liability for any alleged failure to enact, follow or enforce the law or its own rules or policies. (Dkt. 42 at 8–9). Specifically, the Board seeks to dismiss Plaintiffs' claims for NEID, failure to supervise, and negligent failure to control Cruz's conduct (Counts II, III, VIII, X and XI) which allege the Board "fail[ed] to document complaints received against Cruz in violation of [Board] policies" (Dkt. 40 at ¶¶ 145(c), 152(c), 200(c), 207(c)) and failed to warn or disclose to individual female students and their parents the past complaints received against Cruz. (*Id.* at ¶¶ 144(d), 152(d)-(f), 183, 200(d), and 207(d)-(f)). The Board argues the latter allegation "indirectly criticiz[es] the Board policy and procedure related to parent and student notifications, warnings and/or other communications and the nature and extent of any prior investigations." (Dkt. 42 at 6).

Section 2-103 of the Act immunizes local public entities from liability for "an injury caused by adopting or failing to adopt an enactment or by failing to enforce any law." 745 ILCS 10/2-103. Section 2-205 similarly immunizes any public employee from liability "for any injury caused by his adoption of, or failure to adopt, an enactment or by his failure to enforce any law." *Id.* at § 10/2-205. Where applicable, both provisions provide absolute immunity for both negligence and

willful and wanton misconduct. *Vill. of Bloomingdale v. CDG Enterprises, Inc*., 752 N.E.2d 1090, 1098 (2001).

Section 2-103 and 2-205 apply to claims based on violations of "law," which the Act defines to include any "constitutional provision, statute, ordinance or regulation" or any "rule . . . or order . . . having the force of law." *See* 745 ILCS 10/1-203, 1-205, 1-208.  The Board claims that its "policies" have the force of law as required under Section 2-103 and 2-205 on two grounds: (1) pursuant to 105 ILCS 5/34-19 which provides that the "by-laws, rules and regulations" established by the Board for the management of its schools "shall have the force of ordinances" (Dkt. 42 at 8) and (2) as part of the School Code.  (*See* Dkt 42 at 8–9, Dkt.  (citing to *Doe v. Vill. of Schaumburg*, 955 N.E.2d 566 (Ill. App. Ct. 2011) and *Donovan v. Cmty. Unit Sch. Dist. 303*, 37 N.E.3d 313 (Ill. App. Ct. 2015) in which Illinois state courts held that a school district was immune under Section 2-103 for adopting a policy that allegedly violated the Illinois School Code)).  Both arguments fail.  First, the Complaint never explicitly alleges that the Board failed to enforce either any "by-laws, rules or regulations" established under 105 ICLS 5/34-19 or the School Code; Plaintiffs allege only that the Board violated "BOE policies."  Second, the Complaint never identifies the specific policies allegedly violated such that the Court could find as a matter of law that the alleged violation constitutes a violation of a "by-law[], rule[] or regulation" under 105 ICLS 5/34-19 or of the School Code or, for that matter, of any other "law" as defined by the Act.  Therefore, the Board fails at this stage to meet its burden to show based on the face of the Complaint that it is protected from liability under Section 2-103 or 2-205 for any claim.

## B.    Failure to Provide Police Protection, § 4-102

The Board next claims that it is immune from liability for any claim arising out its alleged failure to provide protection to Plaintiffs from Cruz's alleged misconduct under Section 4-102 of

the Act.  Specifically, the Board seeks to dismiss Plaintiffs' claims for NEID, failure to supervise, negligence, willful and wanton conduct, and negligent failure to control Cruz's conduct—which allege the Board "fail[ed] to protect" Jane Doe I and II despite knowing Cruz had sexually harassed other female students (*see, e.g.,* Dkt. 40 at ¶¶ 145(b), 152(b), 156(d)) and "fail[ed] to properly investigate and protect students" from misconduct that would likely result in injury (*see, e.g., id.* at ¶¶ 159. 214)—on this basis.  (Dkt. 42 at 9–10).

Section 4-102 immunizes local public entities and public employees from liability for failing to provide police protection services or inadequate police protection services:

> Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals.

745 ILCS 10/4-102.  Where applicable, Section 4-102 applies both to negligent and willful and wanton misconduct.  *DeSmet ex rel. Estate of Hays v. Cty. of Rock Island*, 848 N.E.2d 1030, 1041 (Ill. 2006).

Section 4-102 codified the common law public-duty rule that a public entity is under no duty to provide and is not liable for its failure to provide adequate government services, such as police protection.  *Albert v. Bd. of Educ. of City of Chi.*, 24 N.E.3d 28, 43 (Ill. App. Ct. 2014) (citing *Aikens v. Morris*, 583 N.E.2d 487, 490 n.1 (Ill. 1991)).  Immunity under Section 4-102 attaches only if the safeguards the Board allegedly failed to implement constitute "police protection services."  *See Doe ex rel. Ortega-Piron v. Chi. Bd. of Educ.,* 820 N.E.2d 418, 421 (Ill. 2004) ("[T]he plain language of section 4–102 provides that immunity for failure to prevent a crime attaches "*if police protection service is provided.*") (emphasis in original).  "Police protection services" are functions traditionally performed by police out of their duty owed to the

public at large, for example, weapons detection, traffic control, and crowd security and control. *Id.* at 422; *see also, e.g., Albert*, 24 N.E.3d at 43 (Immunity under the public-duty rule as codified in Section 4-102 "shields municipalities and their employees from liability when conducting customary duties toward the public at large.").

Throughout the Complaint, Plaintiffs allege the Board failed to protect them in various ways including by failing to supervise Cruz, to discipline Cruz, to implement a "safety plan," to properly investigate past complaints against Cruz, and to warn or disclose past complaints against Cruz to female students and their parents. (*See, e.g.,* Dkt. 40 at ¶¶ 76, 113, 156, 182). In determining whether these safeguards constitute "police protection services," the Court must focus on the *purpose* of providing these safeguards in the first place and not on the conduct causing the alleged injuries. *Ortega-Piron*, 820 N.E.3d at 423. Here, the Board's purpose in supervising, investigating complaints against, and disciplining teachers and staff—in the most general sense as the alleged in the Complaint—is to monitor school district employees, enforce Board policies, and manage the educational environment provided for students; it is not necessarily to enforce the law or to identify, investigate and/or apprehend suspected perpetrators of crime. *See, e.g., id.* at 421–23 (Section 4-102 did not apply to claim based on failure to provide bus attendant because the Board's purpose in providing attendant was to monitor students' conduct, analogous to a teacher supervising a classroom, and not to enforce the law or apprehend or restrain a passenger). In other words, such safeguards are intended to provide functions typical of a school district, not police. The cases relied on by the Board are distinguishable in that they involve claims for failure to provide security after school or for non-school related activities and, therefore, more easily categorized as traditional police, rather than school, functions. *See, e.g., Albert*, 24 N.E.3d at 43 (failure to provide security personnel or safe transportation in order to protect students from rival

gangs after school constitute "police protection services"); *Green v. Bd. of Educ.*, 944 N.E.2d 459, 465 (Ill. App. Ct. 2011) (complaint "focus[ed] on security and policing measures around the school" sufficiently alleged s failure to provide "police protection services" for purposes of Section 4-102); and *Towner by Towner v. Bd. of Educ. of City of Chi.*, 657 N.E.2d 28, 31 (Ill. App. Ct. 1995) (failure to provide security outside of school building for non-school related activities at the end of the school day constituted "police protection services"). Thus, the Court finds that the Board also fails, at least at this stage, to establish its immunity under Section 4-102.

### C. Failure to Supervise, § 3-108

The Board claims that it is immune under Section 3-108 of the Act from liability for Plaintiffs' "failure to supervise" claims (Counts III and XI) and negligence claims based on its alleged "failure to adequately supervise" Cruz (Counts IV, XII and VIII). (*See* Dkt. 40 at ¶¶ 156, 211, 185). Section 3-108 provides:

> (a) Except as otherwise provided in this Act, neither a local public entity nor a public employee who undertakes to supervise an activity on or the use of any public property is liable for an injury unless the local public entity or public employee is guilty of willful and wanton conduct in its supervision proximately causing such injury.

> (b) Except as otherwise provided in this Act, neither a local public entity nor a public employee is liable for an injury caused by a failure to supervise an activity on or the use of any public property unless the employee or the local public entity has a duty to provide supervision imposed by common law, statute, ordinance, code or regulation and the local public entity or public employee is guilty of willful and wanton conduct in its failure to provide supervision proximately causing such injury.

745 ILCS 10/3-108. This provision provides immunity only for negligent conduct; it does not apply to allegations of willful and wanton misconduct (*id.*) and, therefore, provides no immunity to the Board for Plaintiffs' failure to supervise claims in Counts III and IX. (*See* Dkt. 40 at ¶¶ 152, 207 (alleging the Board was "willful and wanton" in failing to supervise Cruz)). Plaintiffs' negligence and negligent failure to control conduct claims, however, include no such allegations

of willful and wanton misconduct (*see id.* at Counts IV, XII and VIII) and are barred by Section 3-108 to the extent they are based on allegations that the Board was negligent in supervising Cruz. *See Doe 20*, 680 F.Supp.2d 857, 991 (C.D. Ill. Oct. 20, 2009) (Section 3-108 "covers supervision of an employee, even though the statute refers to an activity"); *Peck v. W. Aurora Sch. Dist. 129*, No. 06 C 1153, 2006 WL 2579678, at *7 (N.D. Ill. Aug. 30, 2006) (Section 3-108 barred negligent supervision claim against Board based on alleged failure to properly monitor and supervise teacher despite various complaints of harassment and molestation against him). Therefore, the Court dismisses Plaintiffs' claim for negligent failure to control Cruz's conduct (Count VIII) and claim for negligence based on the failure to supervise Cruz (Counts IV, XII) without prejudice. Plaintiffs' negligence claims in Counts IV and XII based on other allegations, for example, failure to warn or to investigate or to protect (*see, e.g.,* Dkt. 40 at ¶ 211(a), (b), (d)), are unaffected by Section 3-108 and may proceed as alleged.

### D.     Implication of Discretionary Policy Decisions, § 2-201

The Board argues it is immune under Section 2-201 of the Act from liability for Plaintiffs' failure to supervise, negligence, willful and wanton misconduct, negligent retention, negligent failure to control Cruz's conduct claims (Counts III–VI, VIII, XI–XIII) because they implicate policy decisions made by the Board related to employee discipline, supervision, and retention. (Dkt. 42 at 11–13). Section 2-201 immunizes public employees from liability where the injury claimed is based on a discretionary policy decision:

> Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused.

745 ILCS 10/2–201; *see also, e.g.., Doe ex rel. Doe v. White*, 627 F. Supp. 2d 905, 922 (C.D. Ill. 2009). Where applicable, Section 2-201 provides immunity from liability for both negligent and

willful and wanton misconduct.  *Hascall v. Williams*, 996 N.E.2d 1168, 1175 (Ill. App. Ct. 2013) (citing *In re Chi. Flood Litig.*, 680 N.E.2d 265, 273 (Ill. 1997)).

Illinois courts apply a two-part test to determine which employees may be granted immunity under Section 2-201: the employee (1) must "hold[] *either* a position involving the determination of a policy *or* a position involving the exercise of discretion," and (2) must also have engaged in both the determination of policy *and* the exercise of discretion when performing the act or omission from which the plaintiff's injury resulted." *Id.* (citing *Harinek v. 161 North Clark Sy. Ltd. P'ship*, 692 N.E.2d 1177, 1181 (Ill. 1998)) (emphasis in original).  A policy choice is one "that require[s] the governmental entity or employee to balance competing interests and to make a judgment call as to what solutions will best serve each of those interests.'" *Id.* (quoting *Harrison v. Hardin Cty. Cmty. Unit Sch. Dist. No. 1*, 758 N.E.2d 848, 852 (Ill. 2001)).  A discretionary act is one "unique to a particular public office"; in contrast, a ministerial act is one "which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act."  *Id.* at 1176 (quoting *Snyder v. Curran Twp.*, 657 N.E.2d 988, 993 (Ill. 1995)).

The Board argues generally that "all allegations related to the Board's actions or inactions relative to Cruz's employment would have involved a determination of policy and an exercise of discretion."  (Dkt. 42 at 12).  But deciding whether Section 2-201 applies is a fact-specific inquiry and can be done "only on the particular facts established in a particular case."  *White*, 627 F. Supp. 2d at 923 (citing *Snyder*, 657 N.E.2d at 993 ("[T]his court has long recognized that the distinction between discretionary and ministerial functions resists precise formulation.")).   Here, the allegations in the Complaint, including those cited by the Board in its Motion to Dismiss, rarely identify the public employee who made the decision at issue and, even when they do, provide little

to no detail as to the specific actions or omissions that the employee allegedly took with regard to Cruz's employment. (*See, e.g.,* Dkt. 40 at ¶ 32 ("*RCHS administration* did not contact DCFS and did not discipline Cruz . . ."); ¶ 33 (In spite of Cruz's misconduct, "*BOE* retained Cruz . . ."); ¶¶ 49, 57, 77, 81, 86 ("Despite Cruz's arrest . . . *RCHS and BOE* continued to employ Cruz in various capacities. . ."); ¶ 152 ("*The BOE, by and through its agents and/or employees* acted with a reckless and conscious disregard . . .and were willful and wanton . . . [in] [a]llowing an environment wherein Cruz could utilize school property, during and after school hours, without supervision of his activities, and engage in the sexual abuse" of Doe I and II.); ¶¶ 168, 223 ("The conduct of *RCHS and BOE* in intentionally hiring and retaining Defendant Cruz was willful and wanton . . ."); ¶ 175 ("*The BOE* is also in charge of the hiring, supervision, management, assignment, control and regulation of individuals who serve as staff members, coaches and teachers."); ¶ 223 (*Defendant BOE* . . . [f]ailed to conduct a thorough investigation . . ."); ¶ 214 (*Defendant BOE* knew or should have known that is failure to properly investigate and protect students . . . would likely result in injury to Doe II.") (emphasis added)). The Court cannot determine based on the face of the Complaint whether any of the alleged failures to act by the Board through its unidentified agents and/or employees implicates a discretionary policy decision for purposes of Section 2-201. *See, e.g., Doe 20*, 680 F. Supp. 2d at 991 (declining to apply Section 2-201 where "[a] more developed recorded [wa]s needed regarding 'both the *type of position* held by the employee and *the type of actions* performed or omitted by the employee.'") (quoting *Harinek*, 692 N.E.2d at 1181) (emphasis in original); *White*, 627 F. Supp. 2d at 923 (Such an "important decision" as whether Section 2-201 applies to bar a minor's tort claims "deserves a fully developed factual record."). Because more facts are needed, the Court denies the Board's motion to dismiss these claims as barred under Section 2-201 at this stage.

### E. Negligence Claims based on Criminal Conduct Committed by Cruz

Finally, the Board moves to dismiss any negligence claim against it based on criminal conduct committed by Cruz on the grounds that (a) Cruz was not acting within the scope of his employment when he committed sexual misconduct and (b) the Board had no duty to Jane Doe I or II to prevent criminal acts committed by Cruz. (Dkt. 42 at 13–14).

Specifically, the Board argues it cannot be held liable for NEID based on Cruz's sexual battery of Plaintiffs because Cruz was not acting within the scope of his employment when he committed the sexual misconduct. (Dkt. 42 at 13–14). Whether an employee acted within his or her scope of employment is relevant where the plaintiff seeks to hold a defendant liable under a theory of *respondeat superior*. *See Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 721 (7th Cir. 2012). That is not the case here. Here, Plaintiffs seek to hold the Board *directly* liable for its own negligence in failing to "under[take] appropriate measures to prohibit and prevent Cruz from engaging in inappropriate sexual abuse and harassment of other students" (Dkt. 40 at ¶ 140)—not to hold the Board *vicariously* liable for Cruz's intentional misconduct. *See id.* (distinguishing between claim based *respondeat superior* and negligence claim for direct liability). To prevail on their NEID claim, Plaintiffs need only show "the existence of a duty owed by the defendant to the plaintiff, the defendant's breach of that duty and an injury proximately resulting from that breach." *Phillips v. Exxon Mobil Corp.*, No. 17 C 07703, 2018 WL 3458286, at *3 (N.D. Ill. July 18, 2018) (citing *Corgan v. Muehling*, 574 N.E.2d 602, 606 (Ill. 1991)). Whether Cruz was acting within the scope of his employment when he committed the alleged sexually harassment has no bearing on the claim.

In support of its argument, the Board cites to *Doe ex rel. Doe v. Lawrence Hall Youth Services* in which a student alleged among other things that a school negligently supervised him

by allowing him to sneak off campus and engage in sexual activity with a female teacher. 966 N.E.2d 52 (Ill. App. Ct. 2012). In *Lawrence Hall*, the district court construed the negligent supervision claim as alleging *respondeat superior* liability for the female teacher's misconduct and then dismissed the claim on the grounds that the teacher's sexual misconduct was outside the scope of her employment. *Id.* at 56. The plaintiff argued on appeal that the trial court erred in construing the negligent supervision claim as alleging *respondeat superior* liability and the appellate court affirmed the holding, specifically finding that the negligent supervision claim as alleged encompassed the female teacher's misconduct: "[T]he trial court did not err where the issue of *respondeat superior* must necessarily be addressed based on plaintiff's allegations that defendant, through its 'various agents and employees,' *including [the female teacher] Pithyou*, negligently supervised plaintiff, causing him injury." *Id.* at 60 (emphasis added). Here, the NEID claim in the Complaint cannot possibly be construed to allege *respondeat superior* liability for Cruz's misconduct. To the contrary, unlike in *Lawrence Hill*, the NEID claim in the Complaint specifically distinguishes between the Board's alleged negligent conduct and Cruz's intentional misconduct by basing the negligence claim on the Board's (and its employees') failure to *prevent* Cruz's intentional misconduct. Whether Cruz committed the sexual misconduct outside the scope of his employment has no bearing on whether the Board or any of its agents or employees was negligent in failing to prevent that misconduct from occurring.

The Board next argues that all negligence claims based on Cruz's criminal conduct must be dismissed because it had no duty to Jane Doe I or II to prevent the criminal acts by a third party. Specifically, the Board seeks to dismiss Plaintiffs' claims for negligent infliction of emotional distress, failure to supervise, negligence, negligent failure to control Cruz's conduct, and willful and wanton conduct—all of which allege the Board's negligent and/or willful and wanton

misconduct failed to prevent Cruz's alleged sexual harassment and abuse of Plaintiffs—on this basis. (*See* Dkt. 40 (Counts II, III, IV, V, VIII, X, XI, XII and XIII)). Generally, a person has no duty under Illinois law to act affirmatively to protect another from criminal conduct by a third person. *Doe-2 v. McLean Cty. Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507, 514 (7th Cir. 2010) (citing *Iseberg v. Gross*, 879 N.E.2d 278, 284 (Ill. 2007) (citing Restatement (Second) of Torts § 314 (1965)). There is an exception to this general rule, however, where the defendant has a "special relationship" with the plaintiff and "Illinois courts have recognized that some relationships between public school districts and their students create a duty to protect, but only under certain circumstances." *Id.* at 515 (citations omitted). In particular, "a school district with unique knowledge that one of its teachers or students poses a particular threat to another student may acquire a duty to protect." *Id.* (citing among other cases *Doe v. Dimovski*, 783 N.E.2d 193, 200 (Ill. 2003) (allegations that school board failed to act upon learning of the sexual transgressions of a teacher with one student were sufficient to show a conscious disregard for the safety of other female students)); *c.f. Lawrence Hall*, 966 N.E.2d at 62–63 (Schools have no duty "to guard against the *unanticipated* willful and wanton misconduct by others.") (emphasis added). Here, as discussed already, Plaintiffs have sufficiently alleged that the Board had knowledge that Cruz posed a threat to Jane Doe I and II.

Additionally, the Board could be held liable for each of these claims under an alternative theory of liability: breach of the duty under Illinois law to protect Jane Doe I and II against harms created by *their own* conduct. *See id.* at 515 ("While persons generally have no duty to protect against dangers created by third parties, they do have a duty to protect against harms created by their own conduct.") (citing *Cuyler v. United States*, 362 F.3d 949, 952–53 (7th Cir.2004)). For example, Plaintiffs allege the Board continued to employee Cruz and withheld information

concerning prior complaints of sexual harassment and abuse by Cruz from female students and their parents or guardians.  (*See, e.g.*, Dkt. 40 at ¶¶ 207).  Such allegations plausibly allege the Board created the risk that Cruz would harass Jane Doe I and II and, therefore, assumed a duty to protect her against such risk.  *See, e.g., McLean Cty.* at 516 (school district created risk that teacher would harass student, and in doing so assumed a duty to protect her, when it took deliberate steps to secure a position for the teacher while concealing his known history of sexual harassment).

Accordingly, the Court denies the Board's motion to dismiss any of the negligence claim asserted against it based on criminal conduct committed by Cruz on either of these bases.

### CONCLUSION

For the reasons stated above, the Board's Motion to Dismiss (Dkt. 42) is granted in part and denied in part.  The Court dismisses without prejudice Plaintiffs' claim for Negligent Failure to Control Conduct of Cruz (Count VIII) and claims for Negligence based on the failure to supervise Cruz (Counts IV, XII).   All other claims, including Plaintiffs' claim for Negligence based on other allegations, may proceed as alleged.


Hon. Virginia M. Kendall
United States District Judge

Date: February 1, 2019